**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CASE NO. _____

SECURITIES AND EXCHANGE COMMISSION,

                                 **Plaintiff,**

v.

MARK A. LEFKOWITZ,
COMPASS CAPITAL GROUP, INC.,
MARK A. LOPEZ,
UNICO, INC.,
STEVEN R. PEACOCK,
SHANE H. TRAVELLER, and
ADVANCED CELL TECHNOLOGY, INC.,

                                 **Defendants.**

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

### SUMMARY

1.      This matter involves the illegal distribution of billions of shares of penny stocks through the repeated misuse of the exemption from registration contained in Section 3(a)(10) of the Securities Act of 1933 ("Securities Act").  Section 3(a)(10) provides an exemption from registration that permits a company to issue common stock to public investors "in exchange for one or more bona fide outstanding securities, claims or property interests" without having to file a registration statement, "where the terms and conditions of such issuance and exchange are approved after a hearing upon the fairness of such terms and conditions" by any court or any governmental authority "expressly authorized by law to grant

such approval."   The Section 3(a)(10) exemption is not available where, as here, certain terms and conditions of the settlement are not presented to the court for consideration at a fairness hearing; nor is the exemption available for capital-raising.

2.      In or about early 2006, Mark A. Lefkowitz ("Lefkowitz"), a penny stock financier and recidivist violator of the federal securities laws, developed an illegal strategy for penny stock issuers to pay off past due debts while, at the same time, raising additional capital through the improper use of Section 3(a)(10).

3.      Lefkowitz first introduced his strategy in 2006 to Mark A. Lopez ("Lopez"), the chief executive officer of Unico, Inc. ("Unico"), a penny stock issuer based in San Diego, California.  Lefkowitz subsequently introduced the strategy to Steven R. Peacock ("Peacock") and Shane H. Traveller ("Traveller"), two penny stock advisors, and William Caldwell IV, the chief executive officer of Advanced Cell Technology, Inc. ("Advanced Cell"), a penny stock issuer based in Worcester, Massachusetts.  Peacock and Traveller, in turn, presented the strategy to other penny stock issuers.

4.      From September 9, 2006 through January 29, 2009, more than fifty pre-settled lawsuits were filed in the Circuit Court of the Twelfth Circuit in and for Sarasota County, Florida ("Sarasota County Court") under the pretext of settling past-due debts owed by Unico, Advanced Cell, or other penny stock issuers (collectively "Penny Stock Issuers") to Compass Capital Group, Inc. and several offshore financing entities for whom Lefkowitz was an agent, or Sequoia International, Inc., for whom Peacock was a controlling person and Traveler an agent (collectively, the "Financiers").

5.      In each case, a Financier held, or acquired for purposes of implementing the strategy, the past-due debt of a Penny Stock Issuer and sought to enforce its rights under the debt instrument.  A lawsuit ensued.  The Penny Stock Issuer then executed a settlement agreement with the Financier pursuant to which it agreed to issue unrestricted common stock to the Financier at a substantial discount to the prevailing market price, purportedly to retire the past due debt.  The number of settlement shares reflected in the settlement agreement was always based on a negotiated discount to the market price and/or a multiple of the face value of the debt, which, in turn, meant that the shares had an actual market value on the date the settlement agreement was executed that exceeded the face value of the past due debt by multiples.  Following a fairness hearing held by the Sarasota County Court, a Section 3(a)(10) exemption was granted, and unrestricted shares were issued to the Financier, which quickly sold the shares on the open market to public investors unaware of the dilutive effects of the new stock issuances.  The Financier subsequently remitted monies to the Penny Stock Issuer, directly or through an intermediary, making it a capital-raising transaction for the Penny Stock Issuer.  None of the settlement agreements that were submitted to the Sarasota County Court for approval at the fairness hearings disclosed, nor did the parties ever apprise the presiding judges, that the market value of the shares to be issued greatly exceeded the debts that were to be extinguished or that significant sums of monies would be remitted to the Penny Stock Issuers following a quick sale of the Section 3(a)(10) settlement shares to the public on the open market and that the Issuers were impermissibly raising capital through the Section 3(a)(10) exemption.

3

6.      Between February 2006 and January 2008, Unico issued over nine billion shares of common stock to Compass and other Financiers affiliated with Lefkowitz in purported reliance on the Section 3(a)(10) exemption; it received payments from them of approximately $9.2 million, while extinguishing less than $4 million in debt.  Between February 2007 and May 2008, other Penny Stock Issuers issued, collectively, nearly 3 million shares of common stock to Sequoia in purported reliance on the Section 3(a)(10) exemption and received payments from Sequoia of $1.2 million while extinguishing $1 million in debt.  Between September 2008 and January 2009, Advanced Cell issued over 260 million shares of common stock to Financiers related to Lefkowitz in purported reliance on the Section 3(a)(10) exemption and received payments from them of $3.5 million, while extinguishing a mere $1.1 million in debt.  None of the transactions in which settlement shares were issued were registered with the Commission and none satisfied any exemption from registration, including Section 3(a)(10).

7.      Through their conduct, each Defendant violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; Unico and Advanced Cell violated Section 13(a) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(a)] and Rules 12b-20 (Unico), 13a-1 (Unico), and 13a-11 (Unico and Advanced Cell) thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11]; Lopez aided and abetted Unico's violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11]; Peacock violated Exchange Act Section 13(d)  [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1]; and Traveller aided and abetted Peacock's violations of Exchange Act Section

13(d) [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1]. Lefkowitz and Compass Capital are recidivist securities law violators who, in November 2009, were permanently enjoined from violating the antifraud and securities registration provisions of the federal securities laws. Unless restrained and enjoined by this Court, the other Defendants each are likely to continue to commit similar violations of the federal securities laws in the future.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Securities Act Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.     This Court has personal jurisdiction over each of the Defendants, and venue is proper in the Middle District of Florida because certain acts and transactions constituting violations of the federal securities laws occurred in the Middle District of Florida. For example, all of the lawsuits that resulted in the issuance of unregistered shares pursuant to the Section 3(a)(10) exemption were filed, and the corresponding fairness hearings were held, in the Sarasota County Court in Sarasota, Florida.

10.     In connection with the transactions, acts, practices, and courses of conduct alleged in this Complaint, each Defendant, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

**DEFENDANTS**

11.     **Mark A. Lefkowitz**, age 44, is a resident of Colts Neck, New Jersey.  At all relevant times, Lefkowitz held himself out as the President and Chief Executive Officer of Compass Capital Group, Inc. and had trading authority in Compass Capital's brokerage accounts and was an authorized signatory on Compass Capital's bank accounts.  Lefkowitz was also the U.S. agent and representative of at least the following offshore entities that provided financing to penny stock issuers in the United States:  Blue Marble Investments, Ltd. ("Blue Marble"), Galleon Investments, Ltd. ("Galleon Investments"), Ice Cap Holdings, Ltd. ("Ice Cap Holdings"), Kentan Limited Corporation ("Kentan Ltd."), Outboard Investments, Ltd. ("Outboard Investments"), Reef Holdings, Ltd. ("Reef Holdings"), Transition Holdings, Ltd. ("Transition Holdings"), Tuxedo Holdings, Ltd. ("Tuxedo Holdings"), Umbrella Holdings, Ltd. ("Umbrella Holdings"), and Yanzu, Inc. ("Yanzu").

12.     The Commission previously sued Lefkowitz in a case captioned SEC v. Compass Capital Group, Inc., et al., Case No. 2:08-CV-00457 (D. Nev.).  On November 30, 2009, final judgment was entered against Lefkowitz in that action, whereby Lefkowitz was permanently enjoined from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] and Sections 10(b) (antifraud provision), 13(d), and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78o(a)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13d-1]; was barred for a period of five years from participating in an offering of penny stock; and was ordered to pay disgorgement of $750,000, jointly and severally with Compass Capital.  Also in 2009, the Commission barred Lefkowitz from association with any broker or dealer.

13.   **Compass Capital Group, Inc.** ("Compass Capital") is a New York corporation with its principal place of business in New York, New York, which purports to provide consulting and investment banking services to clients, including penny stock issuers. Compass Capital was controlled by Lefkowitz at all relevant times.  It is not registered with the Commission.

14.   On November 30, 2009, in SEC v. Compass Capital Group, Inc., et al., Case No. 2:08-CV-00457 (D. Nev.), final judgment was entered against Compass Capital whereby it was permanently enjoined from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] and Sections 10(b) (antifraud provision), 13(d), and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78o(a)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13d-1]; was barred for a period of five years from participating in an offering of penny stock; and was ordered to pay disgorgement of $750,000, jointly and severally with Lefkowitz.

15.   **Unico, Inc.** ("Unico") is an Arizona corporation with its headquarters in San Diego, California, which purports to be in the mining business.  Unico's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on the Over-the-Counter Bulletin Board ("OTC Bulletin Board") under the symbol "UNCO." During the relevant period, Unico's stock was a penny stock, as defined by Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], which traded at a price per share well under $1 at all relevant times.

16.     **Mark A. Lopez**, age 48, is a resident of San Diego, California.  Lopez has been the Chief Executive Officer of Unico since 2004.  Lopez also periodically held himself out to be the Chief Financial Officer of Unico, including in 2007.

17.     **Steven R. Peacock**, age 66, is a resident of Fallbrook, California.  From December 2004 to August 2007, Peacock was the sole shareholder and a controlling person of Sequoia International, Inc., an off-shore entity that purports to be in the business of providing financing to penny stock issuers.  Since at least December 2006, Peacock was also a principal and a managing director of Javelin Advisory Group, Inc., a California-based consulting firm which provides consulting services to penny stock issuers.  During the relevant period, Peacock also served as an officer and/or director of the following penny stock companies which issued unrestricted shares in transactions at issue in this Complaint: Franchise Capital Corporation, Inc., (n/k/a Aero Performance Products, Inc.) (from September 2006 to October 2007) and  GTREX Capital, Inc., (n/k/a Green Globe International, Inc.) (from November 2007 through at least February 2010).

18.     **Shane H. Traveller**, CPA, age 45, is a resident of Hyde Park, Utah.  From December 2006 through at least October 2007, Traveller was the designated U.S. agent-representative of Sequoia.  From December 2006 through at least December 2008, Traveller held himself out to be the Chief Executive Officer and a principal agent of Cherry Creek Holdings, Inc. ("Cherry Creek"), a Nevada corporation established by Traveller in December 2006 with its principal place of business in Murrieta, California.  Traveller was an authorized signatory on Cherry Creek's bank account at all relevant times.  From October 2007 through April 2008, Traveller also served as the chief financial officer of Franchise Capital

8

Corporation, Inc., (n/k/a Aero Performance Products, Inc.), which issued unrestricted shares in transactions at issue in this Complaint.

19.     On August 6, 2008, in SEC v. Compass Capital Group, Inc., et al., Case No. 2:08-CV-00457 (D. Nev.), final judgment was entered against Traveller, whereby Traveller was permanently enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and from aiding and abetting violations of the reporting and recordkeeping provisions of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]; was barred for a period of five years from acting as an officer or director of a public company and from participating in an offering of penny stock; and was also ordered to pay a civil penalty of $50,000.

20.     **Advanced Cell Technology, Inc.** ("Advanced Cell") is a biotechnology company, organized under the laws of Delaware but with headquarters in Worcester, Massachusetts, which purports to be in the embryonic stem cell technology business. William Caldwell IV, now deceased, was Advanced Cell's chief executive officer at all relevant times.  Advanced Cell's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on the OTC Bulletin Board under the symbol "ACTC."  Advanced Cell's stock was a penny stock, as defined by Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)] and Rule 3a51-1 thereunder [17 C.F.R. § 2403a51-1], which traded at a price per share well under $1 at all relevant times.

## FACTS

### I. Illegal Unregistered Distribution Of Unico Common Stock

#### A. Development of the Plan

21.     From July 19, 2004 through October 11, 2005, Unico issued at least seventeen convertible debentures to Compass Capital and the following offshore entities for which Lefkowitz served as the U.S. agent and representative: Blue Marble, Kentan Ltd., Outboard Investments, Reef Holdings, Umbrella Holdings, and Yanzu (collectively, with Compass Capital, the "Lefkowitz Related Entities").

22.     The convertible debentures had the same basic terms, including a six month maturity date, an annual accrued interest rate of eight percent, and conversion rights that gave both the debt holder and Unico the option of converting "all or any part of the principal plus accrued interest into shares of Unico's common stock at a price per share equal to fifty percent of the closing bid price of the common stock on the date of the notice of conversion." Importantly, under the terms of the convertible debentures, if either party requested a conversion, Unico was *required* to issue *unrestricted* shares to the debt holder, either through a transaction pursuant to a registration statement or the application of an exemption from registration.  Furthermore, because the discount rate was so favorable to the debt holder, the debt holder had an incentive to choose the conversion option rather than accept the accrued interest at maturity.

23.     When the seventeen convertible debentures were issued to the Lefkowitz Related Entities, Unico was a Business Development Company ("BDC") under the Investment Company Act of 1940 ("Company Act"), and, as a result, was allowed to issue securities

10

without filing a registration statement pursuant to the exemption from registration provided in Regulation E of the Securities Act if certain requirements were satisfied.

24. Through mid-October 2005, as the seventeen convertible debentures started to mature, the debt holder, one of the Lefkowitz Related Entities, exercised its conversion rights, which resulted in the issuance of unrestricted shares of Unico common stock pursuant to the Regulation E exemption.

25. On October 12, 2005, however, Unico withdrew its status as a BDC and could no longer issue unrestricted common stock pursuant to the Regulation E exemption. At the time, the Lefkowitz Related Entities still owned twelve Unico convertible debentures and, when such debentures matured, Unico could not satisfy its obligations to pay or issue securities.

26. Thereafter, Lefkowitz and Lopez began discussing other ways for Unico to satisfy its obligations under the convertible debentures, including by having Unico file a registration statement with the Commission. Lefkowitz referred Lopez to a law firm based in New York City ("NYC Law Firm") that had represented the Lefkowitz Related Entities previously and had experience filing registration statements for penny stock issuers.

27. Attorneys at NYC Law Firm advised Lopez, in early 2006, that a registration statement could take at least eighteen months to draft and file, could cost a significant amount of money, and ultimately might not be declared effective by the Commission.

28. Upon information and belief, at or about the same time, Lefkowitz and a partner of the NYC Law Firm were discussing the Lefkowitz Related Entities' options with respect to the convertible debentures, including the possibility of filing lawsuits against Unico for

11

failure to satisfy its obligations, and settling those lawsuits with shares to be issued under the Section 3(a)(10) exemption.

29.    The NYC Law Firm partner subsequently told Lopez that the firm had a conflict of interest and could not represent Unico in any transaction because clients of the firm (the Lefkowitz Related Entities) were contemplating pursuing claims against Unico under the convertible debentures.

30.    The NYC Law Firm partner thereafter explained to Lopez the mechanics of the Section 3(a)(10) exemption, including, most significantly, the ability to exchange past due debt for unrestricted shares of an issuer's common stock by filing a lawsuit and getting an order from a court approving the fairness of the exchange.

31.    The partner informed Lopez that Unico would need to retain independent counsel and Lopez subsequently was introduced to and retained counsel in Florida to represent Unico in pre-settled lawsuits filed by the Lefkowitz Related Entities against Unico in the Sarasota County Court.

### B.  Overview of the Section 3(a)(10) Settlements Between the Lefkowitz Related Entities and Unico

32.    In early 2006, following their conversation with attorneys at NYC Law Firm, Lefkowitz and Lopez devised a plan not only to satisfy Unico's obligations on the outstanding convertible debentures, but also, to provide funding to Unico, through the misuse of the Section 3(a)(10) exemption.

33.    The plan called for the Lefkowitz Related Entities to file lawsuits against Unico purportedly to recover the past due amounts owed on the convertible debentures and for Unico to settle the lawsuits by issuing shares of Unico common stock to the Lefkowitz

12

Related Entities pursuant to the Section 3(a)(10) exemption.  The settlement shares would be priced at a substantial discount to the prevailing market price as well as to the fifty percent discount reflected on the face of each convertible debenture, but, the settlement agreements would reference only the amount of shares to be issued, not the market value of the shares. The result would be that, if the Section 3(a)(10) settlement was approved, the debt holder (a Lefkowitz Related Entity or Entities) would receive unrestricted shares that could immediately be sold on the open market at values that were multiple times greater than the face of the debenture.  The plan included an agreement for the Lefkowitz Related Entities or their intermediaries to remit monies to Unico, thereby providing Unico with much needed financing.  The plan was a win-win situation for all parties to the transaction, although illegal.

34.     Thereafter, from February 9, 2006 through January 2, 2008, the Lefkowitz Related Entities filed thirty-four pre-settled lawsuits against Unico in the Sarasota County Court, according to plan.

35.     Typically, Lefkowitz and Lopez selected a past due Unico convertible debenture that had been issued to one of the Lefkowitz Related Entities.  Lefkowitz then sought to exercise the entity's conversion right and/or divided the past due convertible debenture into segments, and assigned the segments to other Lefkowitz Related Entities, whose conversion rights Lefkowitz then sought to exercise.

36.     Lefkowitz and Lopez then discussed the terms of a settlement, including the number of shares of Unico common stock that Unico would issue to each debt holder in exchange for the past due debt.  The number of settlement shares was ultimately determined

13

by a negotiated price that gave each debt holder a greater than fifty percent discount to the per share market price of Unico common stock, i.e., a discount that exceeded what the debt holder was entitled to under the debenture. For example, Compass Capital owned a $15,000 segment of a past due Unico convertible debenture pursuant to which $16,647.44 was due and owing to Compass Capital. On February 9, 2006, the date the settlement agreement was executed, Unico common stock closed at a price of $ 0.004 per share. However, Lefkowitz and Lopez agreed that the number of settlement shares to be issued would be calculated based on a price per share of $0.000625, which translated into Unico agreeing to issue a total of 26,630,269 shares of its common stock to Compass Capital in settlement of that segment of the debenture. The shares had a market value of approximately $106,521 on the date of the settlement, or, more than 6 times the value of the past due debt.

37.     In practice, there was little negotiation on the discount price or the number of shares to be issued in the Section 3(a)(10) settlement. Unico needed financing and Lopez typically accepted whatever number of shares of Unico common stock that Lefkowitz proposed in exchange for the past due debt, even though it meant that the debt holder would receive shares valued well in excess of the amount of debt being extinguished.

38.     The debt holder(s) – the Lefkowitz Related Entity or Entities that held the convertible debenture or segments thereof – then filed a Complaint against Unico in the Sarasota County Court.

39.     Shortly thereafter, the parties executed and submitted to the Court for consideration at a fairness hearing the previously negotiated settlement agreement(s).

14

40.     The fairness hearings typically were held on Friday mornings as part of the Sarasota County Court's Uniform Motion Calendar, an open docket that allows litigants to appear before a judge of the Sarasota County Court to obtain a signed order in an uncontested matter.  Typically, the parties, through local Florida counsel, appeared on Friday morning, presented their settlement agreement(s) to the judge presiding over the motion calendar that day, whereupon, a brief hearing was held and the judge entered an order approving the settlement agreement(s).

41.     None of the pleadings or papers submitted to the Sarasota County Court in connection with the thirty-four lawsuits disclosed (i) the market value of the shares that were to be issued in connection with the settlement or (ii) the parties' agreement to remit monies to Unico after selling the settlement shares.  Instead, the papers misleadingly stated that "no promise or representation of any kind has been made [by the parties] except as expressly stated in this Agreement."  Each settlement agreement was signed by Lopez as the chief executive officer of Unico and, depending on which Lefkowitz Related Entity was a settling debt holder, by Lefkowitz as the chief executive officer of Compass Capital, or by an officer or director of one of the other Lefkowitz Related Entities after Lefkowitz forwarded them the negotiated settlement agreement for signature.

42.     During each fairness hearing, the parties, through local Florida counsel, verbally stipulated to the fairness of the settlement terms, including the exchange of the past due debt for unrestricted shares of Unico common stock.  However, at no point during the hearing did the parties (i) inform the presiding judge what the market value of the settlement shares was, much less that the market value of the settlement shares exceeded the value of the debt being

15

extinguished by multiples or (ii) disclose to the presiding judge that the parties had a side agreement to later remit monies to Unico.  Accordingly, the presiding judge did not have complete information on which to base his/her fairness determination.

43.     Since the true value of the settlements and the side agreements to remit monies to Unico were not disclosed to the Sarasota County Court, proper fairness hearings were not held and the Section 3(a)(10) exemption was not available to Unico.  Furthermore, since neither the parties nor the events underlying their dispute over past-due debts had any connection to Sarasota County, Florida or to Florida at all, the Sarasota County Court did not have jurisdiction over the matter.

44.     Following the entry of an order approving the settlement in each case, and at Lefkowitz's direction, Unico's transfer agent was sent a copy of the order and executed settlement agreement.  The transfer agent thereafter issued unrestricted shares of Unico common stock to the appropriate Lefkowitz Related Entity, c/o Compass Capital (attn. Lefkowitz), in purported reliance on the Section 3(a)(10) exemption.  None of the transactions in which shares were issued were registered with the Commission or satisfied any exemption from registration, including Section 3(a)(10).

45.     Typically within days or weeks after receiving the settlement shares, the Lefkowitz Related Entities sold the shares on the open market to public investors who were unaware of the dilutive effects of the new stock issuances.

46.     As these settlements occurred – from February 2006 to January 2008 – Unico periodically received wire transfers of money from Compass Capital or an intermediary affiliated with the Lefkowitz Related Entities ("Intermediary"), in amounts ranging from

16

$15,000 to $800,000, consistent with what Lefkowitz and Lopez had previously negotiated. These payments were Unico's principal source of financing during this period.

47.     The Intermediary was a long time business associate of Lefkowitz, as well as the president of Kentan, Ltd., one of the Lefkowitz Related Entities, on whose behalf he signed Section 3(a)(10) settlement agreements.  During the relevant period, the Intermediary was also a director of at least five of the Lefkowitz Related Entities: Blue Marble, Kentan Ltd., Outboard Holdings, Reef Holdings, and Yanzu, and had trading authority in their brokerage accounts which received and liquidated the Unico Section 3(a)(10) settlement shares.

48.     After Unico received the payments, and in an effort to conceal the kickbacks, Unico issued Compass Capital or one of the Lefkowitz Related Entities a new convertible debenture with a face value equal to the amount of the kickback.  Such newly-issued convertible debentures were not bona fide debts of Unico as Unico had no plan to repay the holder(s) other than through future lawsuits and settlements in which it sought to issue shares pursuant to the Section 3(a)(10) exemption.

49.     Overall, as a result of thirty-four separate lawsuits relating to Unico convertible debentures, Unico extinguished less than $4 million in debt and issued 8,921,335,034 shares of unrestricted common stock to the Lefkowitz Related Entities in purported reliance on the Section 3(a)(10) exemption.  These shares had a market value of $28,331,307.22 as of the dates when the settlement agreements were executed, or, on average, seven times the value of the past due debt that was extinguished.

50.     The following chart identifies the thirty-four lawsuits filed by the Lefkowitz Related Entities against Unico and, for each, the following information: (i) the date the

17

lawsuit was filed, (ii) the name of the Lefkowitz Related Entity or Entities that brought the suit against Unico, (iii) the face value of the past due convertible debenture(s) that were the purported basis for the lawsuit and ultimate settlement, (iv) the number of shares issued in purported reliance on the Section 3(a)(10) exemption and (v) the market value of the shares on the date the settlement agreement was executed.

| | Date Lawsuit Filed | Plaintiff(s) | Face Value of Past Due Convertible Debenture(s) | Settlement Shares Issued Per Section 3(a)(10) Exemption | Market Value of Section 3(a)(10) Settlement Shares |
|---|---|---|---|---|---|
| 1 | 2/9/2006 | Blue Marble, Outboard, Reef Holdings, Umbrella, Yanzu | $75,000 | 120,575,115 | $482,300.46 |
| 2 | 2/9/2006 | Compass Capital, Kentan | $30,000 | 53,260,538 | $213,042.15 |
| 3 | 3/1/2006 | Blue Marble, Kentan, Outboard, Reef Holdings, Umbrella, Yanzu | $125,000 | 325,804,830 | $612,513.08 |
| 4 | 3/9/2006 | Blue Marble, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $175,000 | 371,875,000 | $743,750.00 |
| 5 | 3/23/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $125,000 | 526,704,636 | $1,053,409.27 |
| 6 | 4/5/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $250,000 | 312,293,016 | $565,250.36 |

| | Date Lawsuit Filed | Plaintiff(s) | Face Value of Past Due Convertible Debenture(s) | Settlement Shares Issued Per Section 3(a)(10) Exemption | Market Value of Section 3(a)(10) Settlement Shares |
|---|---|---|---|---|---|
| 7 | 4/5/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $60,000 | 253,902,739 | $459,563.96 |
| 8 | 4/13/2006 | Blue Marble, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $90,000 | 599,041,095 | $976,436.98 |
| 9 | 4/27/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $250,000 | 1,209,091,038 | $1,366,272.87 |
| 10 | 5/10/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $180,000 | 628,120,548 | $2,280,077.59 |
| 12 | 8/17/2006 | Compass Capital | $32,500 | 2,531,729 | $232,919.07 |
| 11 | 8/17/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $147,996 | 12,397,782 | $1,140,595.94 |
| 13 | 8/31/2006 | Blue Marble, Kentan, Outboard Investments, Umbrella, Yanzu | $50,000 | 7,061,155 | $515,464.32 |
| 14 | 8/31/2006 | Kentan, Reef | $25,000 | 3,521,168 | $257,045.26 |
| 15 | 9/7/2006 | Blue Marble, Kentan | $50,000 | 10,191,636 | $392,377.99 |
| 16 | 9/7/2006 | Compass Capital | $25,000 | 4,897,981 | $188,572.27 |
| 17 | 9/7/2006 | Reef | $25,000 | 4,874,766 | $187,678.49 |

| | Date Lawsuit Filed | Plaintiff(s) | Face Value of Past Due Convertible Debenture(s) | Settlement Shares Issued Per Section 3(a)(10) Exemption | Market Value of Section 3(a)(10) Settlement Shares |
|---|---|---|---|---|---|
| 18 | 9/26/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $110,000 | 34,602,694 | $934,272.74 |
| 19 | 10/12/2006 | Compass Capital | $25,000 | 7,368,421 | $154,736.84 |
| 20 | 10/12/2006 | Reef | $25,000 | 7,368,421 | $154,736.84 |
| 21 | 10/12/2006 | Kentan, Reef | $50,000 | 14,736,842 | $309,473.68 |
| *22 | 10/25/2006 | Compass Capital | $50,000 | 9,615,385 | $144,230.78 |
| *23 | 10/25/2006 | Blue Marble, Outboard Investments | $75,000 | 19,709,168 | $295,637.52 |
| *24 | 10/25/2006 | Umbrella | $25,000 | 10,121,180 | $151,817.70 |
| *25 | 10/25/2006 | Kentan, Reef Holdings, Yanzu | $75,000 | 30,325,605 | $454,884.08 |
| *26 | 11/1/2006 | Blue Marble, Kentan, Outboard Investments, Reef Holdings, Umbrella, Yanzu | $250,000 | 124,579,266 | $1,058,923.76 |
| *27 | 12/6/2006 | Compass Capital | $25,000 | 23,780,824 | $169,557.28 |
| *28 | 1/30/2007 | Outboard Investments | $400,000 | 266,666,666 | $2,799,999.99 |
| *29 | 3/7/2007 | Outboard Investments | $250,000 | 375,000,000 | $2,625,000.00 |
| *30 | 5/8/2007 | Compass Capital, Outboard Investments | $300,000 | 526,315,790 | $2,531,578.95 |
| *31 | 6/20/2007 | Compass Capital, Outboard Investments | $250,000 | 1,000,000,000 | $2,190,000.00 |
| *32 | 8/29/2007 | Compass | $125,000 | 950,000,000 | $1,301,500.00 |
| *33 | 8/29/2007 | Outboard Investments | $100,000 | 950,000,000 | $1,301,500.00 |
| *34 | 1/2/2008 | Outboard Investments | $25,000 | 125,000,000 | $86,250.00 |
| | **Totals** | | $3,875,496 | 8,921,335,034 | $28,331,370.22 |

The asterisk (*) identifies lawsuits involving convertible debentures that had been issued by Unico in connection with earlier Section 3(a)(10) settlements, i.e., that were issued in an effort to cover up the remittances. Such convertible debentures were not bona fide debts as Unico had no intent to satisfy its obligations under such debentures.

51.    In nine of the settlements, Unico issued more than 1.7 billion unrestricted shares of its common stock to Compass Capital.  Lefkowitz caused Compass Capital to sell those

shares within days or weeks after they were received, generating gross sales proceeds totaling approximately $2,475,000. Lefkowitz also caused Compass Capital to remit a total of $765,000 to Unico over time. Unico, in turn, issued new convertible debentures to Compass Capital for the amount of the payments and then falsely recorded the payments on its books and records as proceeds from the sale of additional Unico convertible debentures. Unico had no intent to satisfy its obligations under these new convertible debentures.

52.    In twenty-eight of the settlements, Unico issued more than 7 billion unrestricted shares of Unico common stock to other Lefkowitz Related Entities, which were sold within days or weeks of when each entity received the shares. These sales generated gross proceeds totaling approximately $9.9 million. These entities remitted to Unico, through the Intermediary, an approximate total of $7.4 million during the relevant period. After each payment was received from the Intermediary, with the exception of three payments totaling $750,000, Unico issued a new convertible debenture to one of the Lefkowitz Related Entities in the exact amount of the payment. Lopez caused Unico to falsely record approximately $6.6 million as proceeds from sales of additional Unico convertible debentures. With respect to the three payments totaling $750,000, Unico falsely recorded the $750,000 as an "adjustment in the stock price subsequent to the court ordered settlement."

53.    The vast majority of these thirty-four settlements resulted in issuances of stock that constituted over five percent of the total issued and outstanding shares of Unico common stock. Several issuances exceeding twenty percent of the total issued and outstanding number of shares.

**C. Lefkowitz Introduced His Strategy to Peacock and Traveller Who Then Engaged in Improper Section 3(a)(10) Settlements with Unico**

54.     Lefkowitz introduced his illegal strategy to Steven R. Peacock and Shane H. Traveller in late November 2006 when he offered Traveller an opportunity to purchase a past due convertible debenture that Unico had issued to one of the Lefkowitz Related Entities (Outboard Investments) as of May 17, 2006.

55.     Lefkowitz provided Traveller with an overview of the Section 3(a)(10) exemption.  He explained that Traveller could purchase the past due debt from Outboard Investments for a discount to its face value and subsequently exchange it for unrestricted shares of Unico common stock, at a substantial discount to both the prevailing market price and the discount rate stated in the convertible debenture.  Traveller then approached his long-time business associate, Peacock, and conveyed what he had been told by Lefkowitz.

56.     Peacock and Traveller agreed to pursue the transaction through Sequoia International, Inc. ("Sequoia"), Peacock's offshore financing entity for which Traveller served as the U.S. agent and representative.

57.     Lefkowitz subsequently provided Peacock and Traveller with additional details regarding the steps in a Section 3(a)(10) settlement, including telling Peacock and Traveller that, after they receive the settlement shares, they will able to sell the shares immediately in the open market, but must remit an agreed to amount to Unico.

58.     On December 1, 2006, Sequoia acquired from Outboard Investments a past due Unico convertible debenture for a price of $250,000, which was half of its $500,000 face value.  This is a debenture that Unico had issued in an effort to cover up cash payments

22

received on May 17, 2006, from an earlier Section 3(a)(10) settlement with a Lefkowitz Related Entity or Entities.

59.     Traveller, on behalf of Sequoia, and Lopez, on behalf of Unico, then discussed the terms of a settlement, including the number of shares of Unico common stock to be issued to Sequoia.  Traveller and Lopez, with the approval of Peacock, ultimately decided on a formula for calculating settlement shares that was based on five times the value of the past due convertible debenture.  Traveller and Peacock also agreed to return a portion of the profits from the sale of the settlement shares to Unico as financing.

60.     On December 6, 2006, pursuant to plan, Sequoia filed a Complaint against Unico in the Sarasota County Court.

61.     On December 7, 2006, both parties executed the previously negotiated settlement agreement.  Unico's common stock closed at a price of $ 0.00713 per share that day; however, in the agreement, Unico agreed to issue 350,000,000 settlement shares to Sequoia, which was based on a price per share of $0.001428.   The agreement thus appeared to settle the past-due debt for $500,000, but, the shares actually had a market value of approximately $2.5 million on that date, or, five times the value of the past due debt.

62.     The settlement was submitted to the Sarasota County Court on December 8, 2006, when the parties appeared, through local Florida counsel, for the Court's Friday motion calendar for a fairness hearing.

63.     None of the pleadings or papers submitted to the Sarasota County Court in connection with Sequoia's lawsuit against Unico disclosed (i) the market value of the shares that were to be issued in connection with the settlement or (ii) the parties' agreement that

Sequoia would remit monies to Unico after selling the settlement shares. Instead, the papers misleadingly stated that "no promise or representation of any kind has been made [by the parties] except as expressly stated in this Agreement." The settlement agreement was signed by Lopez as the chief executive officer of Unico and by the President of Sequoia, at the request of Peacock and Traveller.

64.     During the fairness hearing, the parties, through local Florida counsel, verbally stipulated to the fairness of the settlement terms, including the exchange of the past due debt for unrestricted shares of Unico common stock. However, at no point during the hearing, did the parties (i) inform the presiding judge what the market value of the settlement shares was, much less that the market value of the settlement shares exceeded the value of the debt being extinguished by multiples or (ii) disclose to the presiding judge that the parties had a side agreement to later remit monies to Unico. Accordingly, the presiding judge did not have complete information upon which to base his/her fairness determination.

65.     Since the true value of the settlement and the side agreement were not disclosed to the Sarasota County Court, a proper fairness hearing was not held and the Section 3(a)(10) exemption was not available to Unico. Furthermore, since neither the parties nor the events underlying their dispute over Unico's past-due debt had any connection to Sarasota County, Florida or to Florida at all, the Sarasota County Court did not have jurisdiction over the matter.

66.     Following the entry of the Court's order approving the settlement agreement, Unico's transfer agent was sent a copy of the order and executed settlement agreement. The transfer agent thereafter issued 350 million unrestricted shares of Unico common stock in

24

reliance on the Section 3(a)(10) exemption. None of these shares were issued in transactions that had been registered with the Commission or that satisfied any exemption from registration, including Section 3(a)(10).

67. The 350 million shares represented forty-seven percent of Unico's then issued and outstanding shares of common stock. In an effort to ensure that Sequoia would not become a holder of five percent or more of Unico's outstanding common stock at any one time – which would trigger the beneficial ownership reporting requirements of Section 13(d) of the Exchange Act – Peacock and Traveler arranged for the shares first to be transferred to an escrow agent, the Javelin Advisory Group, Inc., rather than Sequoia. Under the terms of the escrow agreement, Unico's board of directors purportedly retained the power to vote the 350 million shares while they remained in escrow, but Peacock and Traveller, through Sequoia, retained the power to direct the disposition of the shares.

68. Peacock and Traveller periodically directed Javelin Advisory to distribute the settlement shares to Sequoia in amounts that ensured Sequoia would not become a holder of five percent or more of Unico's outstanding common stock at any one time.

69. Javelin Advisory initially transferred 35 million (or 10 percent) of the 350 million settlement shares to Sequoia. Peacock and Traveller caused Sequoia to quickly sell the shares on the open market, through Sequoia's brokerage account in the Turks and Caicos ("T&C Broker Dealer").

70. Shortly thereafter, in late December 2006, Peacock, in consultation with Traveller, negotiated a block trade of Unico settlement shares to a private equity fund located

25

in California that provides financing to penny stock issuers ("PE Fund"). PE Fund agreed to purchase 245 million settlement shares from Sequoia for $1,000,000.

71.     On December 29, 2006, after receiving an initial payment of $600,000 from PE Fund, Sequoia, at the direction of Peacock and Traveller, immediately remitted $599,000 to Unico, retaining $1,000 to cover wire and banking fees. On January 12, 2007, Sequoia received a second payment of $400,000 from PE Fund, which Sequoia, again at the direction of Peacock and Traveller, immediately remitted in full to Unico. Sequoia remitted these monies through an intermediary, Cherry Creek Holdings, Inc. ("Cherry Creek"), a United States entity incorporated by Traveller to receive and distribute funds on behalf of Sequoia. At the time, Traveller was also the authorized signatory on Cherry Creek's bank account that received funds from Sequoia.

72.     Although Peacock and Traveller were not required by their agreement with Unico to forward such a large percentage of the proceeds from their block trade to Unico, they decided to do so anyway because they hoped to enter into additional Section 3(a)(10) settlements with Unico in the future.

73.     After Unico received the $999,000 payment, and in an effort to conceal the kickback, Unico and Cherry Creek purported to enter into two separate stock purchase agreements, dated December 29, 2006 and January 12, 2007, the same dates as the kickback payments, pursuant to which Unico purported to sell Cherry Creek 76,119,033 restricted shares of Unico common stock for a total of $999,000. Traveller drafted the stock purchase agreements and forwarded them to Lopez for his review. Traveller subsequently executed the agreements for Cherry Creek and Lopez executed them for Unico. Upon information and

26

belief, Unico never issued any stock pursuant to these agreements and it falsely recorded the $999,000 that it received from Sequoia, through Cherry Creek, as proceeds from an agreement pursuant to which they would issue restricted shares of common stock.

74.     Shortly after the block trade with PE Fund, Peacock caused Javelin Advisory to transfer the remaining 70 million Unico settlement shares to Sequoia.  Between January 31, 2007 and April 1, 2007, Sequoia sold some of these shares in the public market, obtaining proceeds totaling approximately $104,000.

75.     On May 11, 2007, Sequoia, once again through Cherry Creek, remitted $68,000 to Unico, which Unico falsely recorded on its books and records as an "adjustment in the stock price subsequent to the court ordered settlement."

### D. Unico Failed to File Timely Reports with the Commission Concerning Its Improper Section 3(a)(10) Settlements

76.     Unico did not timely report its entry into settlements with the Lefkowitz Related Entities or Sequoia or its issuance of unrestricted shares in connection with the Section 3(a)(10) settlements.  Such settlements were material definitive agreements that were not made in the ordinary course of Unico's business and most were also agreements pursuant to which Unico was to issue five percent or more shares of its then issued and outstanding common stock.  Unico's current shareholders and the broader investing public had no knowledge about the issuance of such shares or the dilution of existing publicly-traded shares until months after Unico adopted and started employing Lefkowitz's illegal Section 3(a)(10) strategy.

77.     On June 7, 2006, Unico filed a Form 8-K in which it disclosed that, between February 9 and May 11, 2006,  it had issued more than four billion shares of common stock

27

pursuant to the Section 3(a)(10) exemption to settle its obligations under past-due convertible debentures.

78.     The next four settlements – all of which Unico entered into in August – were not disclosed until Unico filed its Form 10-Q for the quarter ended August 31, 2006on October 24, 2006.

79.     On December 29, 2006, Unico filed a Form 8-K in which it disclosed that, between September 7, 2006 and December 8, 2006, it issued more than 600 million shares of common stock pursuant to the Section 3(a)(10) exemption.  With respect to the 350,000,000 shares issued to Sequoia, Unico misleadingly reported that the shares were placed in escrow to prevent their immediate resale into the public market.

80.     The remaining Section 3(a)(10) settlements, which occurred between January 2007 and January 2008, were untimely disclosed in periodic filings that Unico made several months after the shares had been resold into the public market.

81.     Lopez signed the foregoing filings in his capacity as chief executive officer of Unico.  In addition, Lopez certified under Section 302 of the Sarbanes-Oxley Act the accuracy of these periodic reports.  During the relevant period, Lopez was also aware of the magnitude of the stock issuances pursuant to each of Unico's thirty-five Section 3(a)(10) settlements.

### E.  Unico Filed False and Misleading Disclosures with the Commission Concerning Its Section 3(a)(10) Settlements

82.     On June 13, 2007, Unico filed with the Commission its annual report on Form 10-K for the fiscal year ending February 28, 2007 ("Unico's 2007 Form 10-K") .  The Form 10-K purported to summarize the Section 3(a)(10) settlements that Unico had entered into

and the Sarasota County Court had approved between March 1, 2006 and February 28, 2007. The Form 10-K did not disclose that the Lefkowitz Related Entities and Sequoia had a side agreement pursuant to which those entities had remitted more than $4 million to Unico from the sale of Section 3(a)(10) settlement shares; rather, Unico falsely identified: (i) $2,525,000 of the monies received during the period as proceeds from the "issuance of convertible debentures;" (ii) $750,000 as "resulting from an adjustment in the stock price subsequent to the court ordered settlement"; and (iii) $999,000 as proceeds from stock payable.  These false and misleading statements helped to disguise from investors that Unico was reduced to raising capital through an improper use of the Section 3(a)(10) exemption and had engaged in a massive illegal distribution of Unico common stock.

83.    On June 2, 2008, Unico filed with the Commission its annual report on Form 10-K for the fiscal year ending February 29, 2008 ("2008 Form 10-K").  The Form 10-K purported to summarize the Section 3(a)(10) settlements that Unico had entered into and the Sarasota County Court had approved between March 1, 2007 and February 29, 2008.  Again Unico did not disclose that the Lefkowitz Related Entities and Sequoia had a side agreement pursuant to which those entities had remitted nearly $5 million to Unico from the sale of Section 3(a)(10) settlement shares; rather, Unico falsely identified (i) the $68,000 received from Sequoia, through Cherry Creek, as the result of "an adjustment in the stock price subsequent to the court ordered settlement" and (ii) the $4,814,854 received from the Lefkowitz Related Entities as  proceeds from the sales of convertible debentures.

84.    Lopez reviewed Unico's 2007 and 2008 Forms 10-K before they were filed with the Commission, and knew, or was reckless in not knowing, that they contained these false

29

and misleading statements.  In particular, having negotiated all of the settlements at issue on Unico's behalf, Lopez knew, or was reckless in not knowing, that the payments received from the Lefkowitz Related Entities and from Sequoia, through Cherry Creek, were made pursuant to the undisclosed side agreements between the parties to remit monies to Unico after the sale of Section 3(a)(10) settlement shares.  He knew or was reckless in not knowing that Unico had issued convertible debentures to cover up the payments and never intended to satisfy its obligations under the newly issued debentures.  He knew or was reckless in not knowing that there had been no modification to any court-ordered settlement that resulted in a $750,000 adjustment to any settlement amount.  He also knew or was reckless in not knowing that, though Unico covered up the $999,000 payment from Sequoia, through Cherry Creek, by executing stock purchase agreements, it had no intent to issue stock pursuant to those agreements.  Despite this knowledge, Lopez nonetheless signed Unico's 2007 and 2008 Forms 10-K in his capacity as the chief executive officer of Unico.  He also certified the accuracy and completeness of those filings, stating, among other things:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report.

30

**II.    Peacock and Traveller Adopt Lefkowitz's Strategy As A Business Model**

**A.  Overview of the Sequoia Section 3(a)(10) Settlements**

85.    Following their Section 3(a)(10) settlement with Unico in December 2006, Peacock and Traveller adopted Lefkowitz's illegal Section 3(a)(10) strategy as a business model that they extended to other penny stock issuers, including, but not limited to: Aero Performance Products, Inc. (f/k/a Franchise Capital Corporation, Inc.) ("Aero"), CLX Medical, Inc. (f/k/a CLX Investments, Inc.) ("CLX"), Green Globe International (f/k/a GTREX Capital, Inc.) ("Green Globe"), and S3 Investment Company, Inc. ("S3"), all of which were clients of Javelin.

86.    From February 2007 to May 2008, Peacock and Traveller caused Sequoia to enter into at least ten Section 3(a)(10) exchanges with penny stock issuers Aero, CLX, Green Globe, and S3. Peacock typically provided the issuers with an overview of a Section 3(a)(10) settlement process. Traveller typically handled the details, working with the initial debt holder to identify past-due debts that Sequoia could acquire, working with the debt holder to then assign the debt to Sequoia, negotiating the specific terms of the settlement agreements including the multiple at which the settlement shares would be issued, signing the settlements agreements as Sequoia's agent, and interacting with local Florida counsel. Although Peacock relinquished ownership and control of Sequoia in August 2007, he and Traveller continued to arrange Section 3(a)(10) settlements for Sequoia through May 2008, as agents.

87.    Peacock and Traveller followed the same basic formula that had been developed by Lefkowitz, including, most significantly, the undisclosed side agreements in which the

31

penny stock issuer agreed to issue shares of its common stock to the debt holder, at a substantial discount to the prevailing market price, in exchange for a portion of the profits from debt holder's subsequent sale of the stock, which would serve as the promised financing.

88.     Peacock and Traveller made one basic modification to the Section 3(a)(10) strategy.  Unlike the Section 3(a)(10) settlement with Unico, in which a convertible debenture assigned to Sequoia served as the basis of the pre-settled lawsuit, Aero, CLX, Green Globe and S3 identified convertible debentures as well as other past due or soon-to-be past due debts owed to third parties, which Sequoia would purchase at face value or a discount to face value from the third party.  Sequoia sometimes even paid the third party with a note which it ultimately paid off with the proceeds from its later sale of Section 3(a)(10) settlement shares.

89.     Peacock and Traveller implemented their new business strategy independent of Lefkowitz for the first time in February 2007.  Peacock approached Green Globe, a penny stock issuer based in Murrieta, California, which was then a client of Javelin.  Peacock provided Green Globe's chief executive officer and certain members of Green Globe's board of directors with an overview of the basic formula for executing a Section 3(a)(10) exchange, including that Sequoia would acquire a Green Globe debt, file a lawsuit that would be settled and approved days later at a fairness hearing in the Sarasota County Court, quickly sell the settlement shares, and remit monies to Green Globe from the net sales proceeds.

90.     Following this discussion with Peacock, Green Globe agreed to participate in the exchange.  It identified a convertible debenture that would be maturing in a few days and

32

pre-negotiated a settlement in which Green Globe agreed to issue Sequoia unrestricted common stock worth five times the value of the past due debt. Peacock negotiated for Sequoia but the terms were approved by Traveller as well.

91.     After Green Globe identified the holder of its soon-to-mature convertible debenture, Peacock negotiated Sequoia's acquisition of the convertible debenture from the third party. On February 23, 2007, an assignment agreement was executed and Sequoia issued a promissory note pursuant to which Sequoia agreed to pay the third party $100,000, for the convertible debenture that had a face value of $243,000, by April 1, 2007. Peacock signed both agreements on Sequoia's behalf.

92.     On February 27, 2007, two days before the convertible debenture actually matured on March 1, 2007, Peacock and Traveller caused Sequoia to file a complaint in the Sarasota County Court against Green Globe. The Complaint alleged that Green Globe had "failed to pay when the [convertible debenture] became due on March 1, 2007."

93.     On March 2, 2007, both parties executed the previously negotiated settlement agreement, which appeared to settle the $243,000 convertible debenture for $243,000. The agreement also stated that Green Globe agreed to issue and deliver to Sequoia 934,000,000 shares of freely trading Green Globe common stock pursuant to Section 3(a)(10) in satisfaction of its settlement obligation. Green Globe's common stock had closed at a price of $0.0015 per share on March 1, 2007, meaning that the shares had a market value of approximately $1,400,000, or five times the value of the debt that was to be extinguished. Peacock signed the agreement on behalf of Sequoia.

33

94.     The settlement was submitted to the Sarasota County Court on March 2, 2007, when the parties appeared, through local Florida counsel, for the Court's Friday motion calendar for a fairness hearing.

95.     None of the pleadings or papers submitted to the Sarasota County Court in connection with Sequoia's lawsuit against Green Globe disclosed: (i) the market value of the 934,000,000 shares that Green Globe was to issue in connection with the settlement or (ii) the parties' agreement that Sequoia would later remit monies to Green Globe after selling the settlement shares.  Instead, the settlement agreement misleadingly stated that "no promise or representation of any kind has been made [by the parties] except as expressly stated in this Agreement."

96.     During the fairness hearing, the parties, through local Florida counsel, verbally stipulated to the fairness of the settlement terms, including the exchange of the past due debt for unrestricted shares of Green Globe common stock.  However, at no point during the hearing, did the parties (i) inform the presiding judge what the market value of the settlement shares was, much less that the market value of the settlement shares exceeded the value of the debt being extinguished by multiples or (ii) disclose to the presiding judge that the parties had a side agreement to later remit monies to Green Globe  Accordingly, the presiding judge did not have complete information upon which to base his/her fairness determination.

97.     Since the true value of the settlement and the side agreement were not disclosed to the Sarasota County Court, a proper fairness hearing was not held and the Section 3(a)(10) exemption was not available to Unico.  Furthermore, since neither the parties nor the events underlying their dispute over Unico's past-due debt had any connection to Sarasota County,

34

Florida or to Florida at all, the Sarasota County Court did not have jurisdiction over the matter.

98.     On March 5, 2007, the transfer agent for Green Globe was notified of the Court's order approving the settlement which called for the issuance of 934,000,000 unrestricted shares of Green Globe's common stock to Sequoia in reliance on the Section 3(a)(10) exemption.  However, because issuing the shares to Sequoia all at once would have caused Sequoia to become a holder of five percent or more shares of Green Globe's common stock, Sequoia requested that the transfer agent issue the shares in increments.  None of the Green Globe shares issued to Sequoia were issued in transactions that had been registered with the Commission or that satisfied any exemption from registration, including Section 3(a)(10).

99.     Subsequent to the entry of the Court's order, Peacock, with Traveller's knowledge and consent, negotiated a block trade of Green Globe settlement shares to PE Fund for $350,000.

100.    Between March 16, 2007 and April 30, 2007, and at the direction of Peacock and Traveller, Sequoia remitted at least $142,206 of the proceeds from the sale of the settlement shares to Green Globe, through Cherry Creek.  Green Globe described the transaction as follows in its Form 10-Q for the quarter ended June 30, 2007, filed with the Commission on August 14, 2007:

> [Sequoia] agreed that half of any surplus proceeds from liquidating the stock over and above the balance due on the note plus accrued interest will be repaid to the Company as a reduction in settlement costs.  As a result of this transaction, the Company recorded settlement costs of $828,800 in the quarter ended March 31, 2007, which represented the value of the shares issued, less the principle and interest owed.  During the quarter ended June 30, 2007, the Company received $142,206 from the note holder resulting from a surplus of

cash after liquidating a portion of the shares.  The cash received has been recorded as a reduction in the settlement costs."

101.    This is not the only time that Sequoia's agreement to remit monies to a penny stock issuer was memorialized in writing.  In connection with a March 2007 settlement between Sequoia and S3, Traveller drafted and executed a letter dated March 14, 2007 that confirmed the parties' understanding regarding the kick back:

> Sequoia hereby agrees that the proceeds from the sale or disposition of the 15 million shares shall be divided as follows: (1) Sequoia shall be entitled to such amount of proceeds as necessary to satisfy the obligation of $75,000; (2) The balance of net sales proceeds from the liquidation of the shares, after payment to Sequoia, shall be divided 50/50 between Sequoia and S3, with S3 receiving 50% of all proceeds in excess of $75,000.  This payment shall be treated as an adjustment to the settlement cost of the Promissory Note.

102.    The following chart identifies the ten lawsuits filed by Sequoia against Aero, CLX, Green Globe and S3 in which unrestricted shares of common stock were improperly issued in reliance on the Section 3(a)(10) exemption, and, for each, the following information: (i) the date the lawsuit was filed, (ii) the identity of the penny stock issuer-defendant, (iii) the face value of the past due debt that purportedly served as the basis for the lawsuit and ultimate settlement, (iv) the number of shares issued in purported reliance on the Section 3(a)(10) exemption and (v) the market value of the shares on the date the settlement agreement was executed:

| Date Lawsuit Filed | Defendants / Penny Stock Issuer | Face Value of Past Due Debt | Section 3(a)(10) Settlement Shares | Market Value of Section 3(a)(10) Settlement Shares on Date Settlement Agreement Executed |
|---|---|---|---|---|
| 2/27/2007 | Green Globe | $243,000 | 934,000,000 | $1,401,000 |
| 3/14/2007 | S3 | $100,000 | 15,000,000 | $900,000 |
| 5/23/2007 | CLX | $50,000 | 50,000,000 | $281,500 |

| Date Lawsuit Filed | Defendants / Penny Stock Issuer | Face Value of Past Due Debt | Section 3(a)(10) Settlement Shares | Market Value of Section 3(a)(10) Settlement Shares on Date Settlement Agreement Executed |
|---|---|---|---|---|
| 8/30/2007 | Aero | $31,495 | 17,500,000 | $175,000 |
| 10/11/2007 | Aero | $80,000 | 72,700,000 | $399,850 |
| 1/2/2008 | Green Globe | $121,000 | 1,000,000,000 | $690,000 |
| 1/9/2008 | Aero | $202,197 | 310,000,000 | $1,026,100 |
| 1/23/2008 | CLX | $150,000 | 250,000,000 | $750,000 |
| 3/25/2008 | Green Globe | $50,000 | 50,000,000 | $250,000 |
| 5/15/2008 | CLX | $26,000 | 130,000,000 | $143,000 |
| **Totals** | | $1,053,692 | 2,829,200,000 | $6,016,450 |

103.     In ten Section 3(a)(10) settlements, Sequoia ultimately received nearly 3 billion unrestricted shares of common stock from four different penny stock issuers: (i) 400,200,000 unrestricted shares of Aero; (ii) 430,000,000 unrestricted shares of CLX; (iii) 1,980,000,000 unrestricted shares of Green Globe; and (iv) 15,000,000 unrestricted shares of S3.  These shares had a collective market value of approximately $6,016,450 when the settlement agreements were executed, or, more than five times the face value of the debts that were extinguished.  None of the transactions in which such shares were issued to Sequoia were registered with the Commission or satisfied any exemption from registration, including Section 3(a)(10).

104.     After liquidating the settlement shares, Sequoia, through Cherry Creek, remitted at least $74,000 to Aero, at least $570,000 to CLX, at least $530,000 to Green Globe, and at least $60,000 to S3.

105.     In at least one of the above referenced Section 3(a)(10) settlements, Peacock and Traveller also acted on behalf of opposing parties in the pre-settled lawsuits.  In particular, in an August 2007 Section 3(a)(10) settlement with Aero, a penny stock issuer based in

Bluffdale, Utah, Peacock acted on behalf of Aero and Traveller acted on behalf of Sequoia. Indeed, Peacock signed both the assignment agreement, which transferred the past due debt from the third party to Sequoia, and the settlement agreement as the chief executive officer of Aero. Similarly, Traveller signed the assignment agreement as the representative agent of Sequoia and the settlement agreement as the chief executive officer of Sequoia. Moreover, Peacock and Traveller negotiated the specific terms of the settlement agreement, including the number of settlement shares to be issued to Sequoia and the undisclosed side agreement to share the profits from the subsequent sale of the settlement shares. The pleadings and settlement agreement did not disclose the side agreement between Peacock and Traveller to remit a portion of the profits from the sale of the settlement shares to Aero, nor did the parties inform the presiding judge of its existence.

## III. The Illegal Distribution Of Unregistered Shares Of Advanced Cell Common Stock

### A. Lefkowitz Introduces the Scheme to Advanced Cell Technology

106. In September 2008, the president of a New York City brokerage and investment firm ("Investment Firm President") introduced Lefkowitz to William Caldwell IV, the chief executive officer of Advanced Cell Technology, Inc.

107. Lefkowitz had retained the Investment Firm earlier in 2008 to help him find investment opportunities for a fee and explained to the Investment Firm President his strategy for purchasing debt from penny stock issuers, converting the debt to unrestricted stock at multiples higher than the face value of the debt through a lawsuit filed in Florida, then selling the stock and remitting a portion of the sale proceeds to the penny stock issuer. The Investment Firm had previously pitched various financing opportunities to Advanced

38

Cell, knew Advanced Cell was in need of financing, and thought Lefkowitz and Advanced Cell would be a good match.

108.    The Investment Bank President and Lefkowitz explained the strategy to Caldwell. Shortly thereafter, Caldwell spoke to one of the local Florida attorneys who had represented Lefkowitz Related Entities in similar litigations filed in the Sarasota County Court, and he agreed to proceed with a Section 3(a)(10) exchange as a way to obtain financing for Advanced Cell.

109.    Advanced Cell's first Section 3(a)(10) exchange with Lefkowitz involved a past due debt of $82,316 that Advanced Cell owed to one of its critical vendors located in New York ("Vendor 1").  On September 19, 2008, after putting the vendor on notice, Caldwell forwarded Vendor 1's contact information to Lefkowitz through the Investment Bank President.  Lefkowitz then negotiated with Vendor 1 for one of the Lefkowitz Related Entities (Outboard Investments) to acquire the past due debt and, on September 23, 2008, Vendor 1 assigned the past due debt to Outboard Investments for $82,316, which was the full amount owed by Advanced Cell on the debt.

110.    In the interim, through the Investment Bank President, Caldwell and Lefkowitz discussed the general terms of a settlement pursuant to which Advanced Cell would issue unrestricted shares of common stock to a Lefkowitz Related Entity in an amount that would give the Lefkowitz Related Entity five to ten times the value of the debt, in return for extinguishing the debt that the Lefkowitz Related Entity would purchase from Vendor 1. Through the Investment Bank President, Caldwell and Lefkowitz also discussed that the

39

Lefkowitz Related Entity would remit to Advanced Cell a portion of the profits from its subsequent sale of the settlement shares in the $350,000 to $400,000 range.

111.    On September 24, 2008, the Lefkowitz Related Entity (Outboard Investments) filed a lawsuit against Advanced Cell in the Sarasota County Court.

112.    On or about September 25, 2008, Outboard Investments and Advanced Cell executed the previously negotiated settlement agreement, which was presented to the Sarasota County Court the next day at a fairness hearing.  The settlement agreement stated that the amount owed under the past due debt was $82,316.51, that Outboard Investments agreed to settle its claim for $82,316.51, and that Advanced Cell agreed to issue to Outboard Investments 16,463,302 shares of freely trading Advanced Cell common stock pursuant to Section 3(a)(10) in satisfaction of its settlement obligation.  Advanced Cell common stock closed at a price of $0.049 per share on September 25, 2008, meaning that, on the date the settlement was executed, the settlement shares had a closing market value of $806,702, or nearly ten times the value of the past due debt.

113.    None of the pleadings or papers that were submitted to the Court disclosed (i) the value of the 16,463,302 shares that Advanced Cell was to issue in connection with the settlement or (ii) the parties' agreement that Outboard Investment would later remit monies to Advanced Cell after selling those shares.  Instead, the settlement agreement falsely stated that "no promise or representation of any kind has been made [by the parties] except as expressly stated in this Agreement."  Caldwell signed the settlement agreement as the chief executive officer of Advanced Cell.

114.   During the September 26 fairness hearing, the parties, through counsel, verbally stipulated to the fairness of the settlement agreement, including the exchange of past due debt for unrestricted shares of Advanced Cell common stock.  However, at no point during the hearing did the parties (i) inform the presiding judge what the market value of the settlement shares was, much less that the market value of the settlement shares exceeded the value of the debt being extinguished by multiples or (ii) disclose to the presiding judge that the parties had a side agreement to later remit monies to Advanced Cell after the shares were sold. Accordingly, the Court did not have complete information before it to determine whether the exchange was fair and reasonable.

115.   Since the true value of the settlement and the side agreement was not disclosed to the Sarasota County Court, proper fairness hearings were not held and the Section 3(a)(10) exemption was not available to Advanced Cell.   Furthermore, since the parties' dispute over past-due debt had no connection to Sarasota County, Florida or to Florida at all, the Sarasota County Court did not have jurisdiction over the dispute.

116.   Later that same day, after the Court entered the order, it was forwarded to Advanced Cell's transfer agent.  At the direction of Caldwell, Advanced Cell's local Florida counsel also drafted and emailed to the transfer agent a letter stating that, as counsel for Advanced Cell, "it is our opinion that the shares should be issued free of any restrictive legend in reliance upon Section 3(a)(10) of the Securities Act, as amended."

117.   On September 29, 2008, the transfer agent issued 16,463,302 unrestricted shares of Advanced Cell common stock to an Outboard Investments brokerage account..  None of the shares were issued in transactions that had been registered with the Commission or that

41

satisfied any exemption from registration, including Section 3(a)(10).  At the time, the 16,463,302 settlement shares represented approximately seven percent of Advanced Cell's issued and outstanding shares of common stock.

118.    Between September 30 and October 9, 2008, Lefkowitz caused Outboard Investments to sell the settlement shares on the open market to public investors unaware of the dilutive effects of the new stock issuances, earning gross proceeds totaling approximately $465,599.  Lefkowitz caused Outboard to remit an emergency payment of $50,000 to Advanced Cell on September 30, 2008 and another payment of $100,000 to Advanced Cell on October 7, 2008.  Both transfers were made by Outboard Investments through the Intermediary – i.e. the person who had funneled payments to Unico on behalf of Lefkowitz Related Entities – in an effort to conceal the relationship between the payments and the Section 3(a)(10) exchange.

119.    At all times relevant to the Advanced Cell transactions, Lefkowitz had trading authorization over the Outboard Investments brokerage account that held the Advanced Cell settlement shares and the Intermediary, who was also the President of Outboard Investments, has authorization over the disposition of assets in that account.

120.    In a further effort to conceal the fact that the $150,000 was financing connected to the Section 3(a)(10) exchange with Outboard Investments, Advanced Cell purported to issue a $150,000 convertible debenture to Transition Holdings Ltd. ("Transition Holdings"), an entity based in Ireland, which is affiliated with Lefkowitz and the Intermediary.  Lefkowitz was the U.S. agent and representative for Transition Holdings at the time and the debenture was sent to his attention for holding.  The Intermediary was Transition Holdings' principal at

the time.  Advanced Cell then falsely recorded the $150,000 on its books and records as proceeds from the sale of a convertible debenture.

### D.  Advanced Cell Adopts the Scheme

121.    Following the success of their initial Section 3(a)(10) settlement, from October 2, 2008 through January 29, 2009, Advanced Cell engaged in twelve more Section 3(a)(10) exchanges with the following offshore entities for which Lefkowitz served as the U.S. agent and representative: Galleon Investments, Ice Cap Holdings, and Tuxedo Holdings, (collectively, the "Lefkowitz Related Entities II").

122.    In carrying out these additional Section 3(a)(10) exchanges, Lefkowitz and Advanced Cell adhered to the same model that they had used in the initial exchange, with one slight modification:  Lefkowitz and Caldwell communicated with each other directly rather than through the Investment Bank President.

123.    The following chart identifies the thirteen lawsuits filed by Outboard Investments or a Lefkowitz Related Entity II against Advanced Cell and, for each, the following information: (i) the date the lawsuit was filed, (ii) the name of the Lefkowitz Related Entity or Entities II that brought the suit against Advanced Cell, (iii) the value of the past due debt that purportedly served basis for the lawsuit and ultimate settlement, (iv) the number of shares issued in purported reliance on the Section 3(a)(10) exemption and (v) the market value of the shares on the date the settlement agreement was executed.

| | Date Lawsuit Filed | Plaintiffs | Value of Past Due Debt | Section 3(a)(10) Settlement Shares | Market Value of Section 3(a)(10) Settlement Shares on Date Settlement Executed |
|---|---|---|---|---|---|
| 1 | 9/24/2008 | Outboard | $82,316.51 | 16,463,302 | $806,702 |

| | Date Lawsuit Filed | Plaintiffs | Value of Past Due Debt | Section 3(a)(10) Settlement Shares | Market Value of Section 3(a)(10) Settlement Shares on Date Settlement Executed |
|---|---|---|---|---|---|
| 2 | 10/2/2008 | Ice Cap Holdings | $48,302.53 | 16,100,843 | $499,126 |
| 3 | 10/16/2008 | Ice Cap Holdings Tuxedo Holdings | $79,840.92 | 31,936,368 | $702,600 |
| 4 | 10/30/2008 | Tuxedo Holdings | $36,163.00 | 18,081,500 | $379,711 |
| 5 | 11/6/2008 | Ice Cap Holdings Tuxedo Holdings | $92,231.22 | 25,619,782 | $922,312 |
| 6 | 11/13/2008 | Ice Cap Holdings | $35,220.00 | 12,357,895 | $370,736 |
| 7 | 11/13/2008 | Tuxedo Holdings | $16,350.14 | 5,736,842 | $172,105 |
| 8 | 11/13/2008 | Tuxedo Holdings | $12,650.00 | 4,438,604 | $133,158 |
| 9 | 11/20/2008 | Ice Cap Holdings Tuxedo Holdings | $100,000.00 | 40,000,000 | $960,000 |
| 10 | 12/11/2008 | Ice Cap Holdings Tuxedo Holdings | $100,200.00 | 50,000,000 | $1,000,000 |
| 11 | 1/8/2009 | Tuxedo Holdings | $100,926.32 | 13,107,312 | $806,099 |
| 12 | 1/15/2009 | Ice Cap Holdings | $108,794.59 | 13,426,666 | $1,409,799 |
| 13 | 1/29/2009 | Galleon Investments | $295,478.00 | 12,846,869 | $3,019,014 |
| | Totals | | $1,108,473.23 | 260,115,983 | $11,181,366 |

124.     These thirteen settlements resulted in Advanced Cell issuing a total of 260,115,983 unrestricted shares of common stock to Outboard Investments (in the first case) or a Lefkowitz Related Entity II (in the other twelve cases) in purported reliance on the Section 3(a)(10) exemption.

125.     After receiving the Section 3(a)(10) settlement shares, Lefkowitz caused the Lefkowitz Related Entities II, like Outboard Investments, to sell the shares within days or weeks into the open market.  Lefkowitz had trading authority in the brokerage accounts of Galleon Investments, Ice Cap Holdings, Outboard Investments, and Tuxedo Holdings that received and liquidated the Advanced Cell shares at issue in this Complaint.

126.     Overall, for all thirteen settlements, the sales yielded Outboard Investments and the Lefkowitz Related Entities II gross proceeds totaling $10,339,928.  Outboard Investments

44

and /or a Lefkowitz Related Entity II remitted $3,500,000 of the gross process to Advanced Cell through the Intermediary in an effort to conceal the relationship between the payments and the Section 3(a)(10) exchange.  Advanced Cell falsely recorded the first $1,500,000 of remittances on its book and records as proceeds from the sale of convertible debentures, which were issued to Transition Holdings and sent to Lefkowitz.  However, the debentures were ultimately cancelled and Advanced Cell ultimately gave Transition Holdings exclusive rights to certain non-core technology patents which Caldwell described as patents that relate to non-core technology and that Advanced Cell otherwise would have abandoned or licensed.

127.    Ten of the thirteen settlements resulted in stock issuances that constituted over five percent of the total issued and outstanding shares of Advanced Cell common stock.

### E.  Advanced Cell Failed to Timely File Required Current Reports With The Commission Concerning Its Section 3(a)(10) Settlements

128.    Advanced Cell did not publicly disclose the issuance of the settlement shares in connection with their thirteen Section 3(a)(10) settlements until May 8, 2009, more than seven months after the first Section 3(a)(10) settlement with Outboard Investments and over four months after its last Section 3(a)(10) settlement with a Lefkowitz Related Entity II.

### FIRST CLAIM FOR RELIEF
### (Against all Defendants)

### Violations of Securities Act Sections 5(a) and 5(c)

129.    Paragraphs 1 through 128 are hereby re-alleged and incorporated by reference, as though fully set forth herein.

130.    As alleged in Paragraphs 21 to 53 and 54 to 75, from February 2006 through January 2008, defendants Lefkowitz, Compass Capital, Lopez, Unico, Peacock and Traveller,

45

singly or in concert, directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell shares of Unico common stock through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, shares of Unico common stock for the purpose of sale or delivery after sale; and/or (c) made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy shares of Unico common stock through the use or medium of a prospectus or otherwise.  No valid registration statement was filed or in effect with the Commission pursuant to the Securities Act respect to the transactions that resulted in the issuance of such shares of Unico common stock and no exemption from registration was available.

131.    As alleged in Paragraphs 85 to 105, from February 2007 through May 2008, defendants Peacock and Traveller, singly or in concert, directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell shares of Aero, CLX, Green Globe and S3 through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, shares of Aero, CLX, Green Globe and S3 for the purpose of sale or delivery after sale; and/or (c) made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy shares of Aero, CLX, Green Globe and S3 through the use or medium of a prospectus or otherwise.  No valid registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the transactions that resulted in the

46

issuance of shares of Aero, CLX, Green Globe or S3 and no exemption from registration was available.

132. As alleged in Paragraphs 106 to 127, from September 2008 through January 2009, defendants Lefkowitz and Advanced Cell, singly or in concert, directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell shares of Advanced Cell common stock through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, shares of Advanced Cell common stock for the purpose of sale or delivery after sale; and/or (c) made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy shares of Advanced common stock through the use or medium of a prospectus or otherwise. No valid registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the transactions that resulted in the issuance of such shares of Advanced Cell common stock and no exemption from registration was available.

133. By engaging in the foregoing conduct, Defendants directly or indirectly, violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) a 5(c) of the Securities Act [15 U.S.C. §§ 78e(a) and 78e(c)].

47

## SECOND CLAIM FOR RELIEF
### (Unico and Advanced Cell)

### Violations of Exchange Act Section 13(a)
### and Exchange Act Rules 12b-20, 13a-1 and 13a-11 thereunder

134. Paragraphs 1 through 128 are hereby re-alleged and incorporated by reference, as though fully set forth herein.

135. Defendant Unico, by engaging in the conduct described above, including in Paragraphs 82 to 84, failed to file factually accurate and complete periodic reports with the Commission concerning its Section 3(a)(10) settlements with the Lefkowitz Related Entities and Sequoia.

136. Defendants Unico and Advanced Cell, by engaging in the conduct described above, including in Paragraphs 76 to 81 and 127 to 128, failed to timely file required current reports with the Commission to report the issuance of shares of their common stock in connection with Section 3(a)(10) settlements.

137. By engaging in the foregoing conduct, Defendant Unico violated, and, unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-11].

138. By engaging in the foregoing conduct, Defendant Advanced Cell violated, and, unless enjoined, is reasonably likely to continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11].

## THIRD CLAIM FOR RELIEF
### (Lopez)

### Aiding and Abetting Violations of Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1 and 13a-11 thereunder

139. Paragraphs 1 through 128 are hereby re-alleged and incorporated by reference, as though fully set forth herein.

140. Defendant Lopez, by engaging in the conduct described above, including in Paragraphs 76 to 84, knowingly and substantially assisted Unico's failure to file factually accurate and complete periodic reports with the Commission and timely file required current reports with the Commission to report the issuance of its common stock in connection with Section 3(a)(10) settlements.

141. By engaging in the foregoing conduct, Defendant Lopez aided and abetted Unico's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§§ 240.12b-20, 240.13a-11, and 240.13a-11], and, unless enjoined, is reasonably likely to continue to aid and abet such violations.

## FOURTH CLAIM FOR RELIEF
### (Peacock)

### Violations of Exchange Act Section 13(d) and Exchange Act Rule 13d-1 thereunder

142. Paragraphs 1 through 128 are hereby re-alleged and incorporated by reference, as though fully set forth herein.

143. Defendant Peacock, by engaging in the conduct described above, including in Paragraphs 67 to 71 and 74, failed to file a Schedule 13D with the Commission upon acquiring more than five percent of Unico's outstanding shares of common stock.

144.    By engaging in the foregoing conduct, Defendant Peacock violated, and, unless enjoined, is reasonably likely to continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## FIFTH CLAIM FOR RELIEF
### (Traveller)

### Aiding and Abetting Violations of Exchange Act Section 13(d)
### and Exchange Act Rule 13d-1 thereunder

145.    Paragraphs 1 through 128 are hereby re-alleged and incorporated by reference, as though fully set forth herein.

146.    Defendant Traveller, by engaging in the conduct described above, including in Paragraphs 67 to 71 and 74, knowingly and substantially assisted Peacock's failure to file a Schedule 13D with the Commission.

147.    By engaging in the foregoing conduct, Defendant Traveller aided and abetted Peacock's violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1], and, unless enjoined, is reasonably likely to continue to aid and abet such violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

### Permanent Injunctions

Issue permanent injunctions, restraining and enjoining Unico, Lopez, Peacock, Traveller, and Advanced Cell from violating Sections 5(a) and 5(c) of the Securities Act, restraining and enjoining Unico from violating Section 13(a) of the Exchange Act and

50

Exchange Act Rules 12b-20, 13a-1 and 13a-11, restraining and enjoining Advanced Cell from violating Section 13(a) of the Exchange Act and Exchange Act Rule 13a-11, restraining and enjoining Lopez from aiding and abetting violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-11, restraining and enjoining Peacock from violating Section 13(d) of the Exchange Act and Rule 13d-1 thereunder, and restraining and enjoining Traveller from aiding and abetting violations of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder.

## II.

### Disgorgement

Issue an Order directing Lefkowitz, Compass Capital, Unico, Peacock, Traveller, and Advanced Cell to disgorge, with prejudgment interest, all profits that they received as a result of the acts and/or courses of conduct alleged in this Complaint.

## III.

### Penalties

Issue an Order directing Lefkowitz, Compass Capital, Lopez, Unico, Peacock, Traveller, and Advanced Cell to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## IV.

### Penny Stock Bars

Issue an Order pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] and Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)], permanently

barring Lopez, Compass Capital, Lefkowitz, Peacock, and Traveller from participating in any

offering of any penny stock.

## V.

## **Further Relief**

Dated:   May 30, 2012                              Respectfully submitted,

                                                  SECURITIES AND EXCHANGE
                                                  COMMISSION


                                                  *Suzanne J. Romajas*
                                           By: Suzanne J. Romajas (Trial Counsel)
                                               Antonia Chion
                                               Yuri B. Zelinsky
                                               Drew M. Dorman
                                               Securities and Exchange Commission
                                               100 F Street, NE
                                               Washington, DC 20549-5971
                                               Telephone: (202) 551-4473
                                               Email: RomajasS@sec.gov

                                               Attorneys for Plaintiff
                                               Securities and Exchange Commission

Grant such other and further relief as the Court deems just and appropriate.

52