**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**SECURITIES AND EXCHANGE**
**COMMISSION,**

      **Plaintiff,**

**v.**                        **Case No.: 8:12-cv-1210-T35-MAP**

**MARK A. LEFKOWITZ, COMPASS CAPITAL**
**GROUP, INC., MARK A. LOPEZ, UNICO, INC.,**
**STEVEN R. PEACOCK, SHANE H. TRAVELLER, and**
**ADVANCED CELL TECHNOLOGY, INC.,**

      **Defendants.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Plaintiff Securities and Exchange Commission's Motion for Entry of Final Judgment by Default Against Compass Capital Group, Inc. (Dkt. 79). Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiff's Motion for Entry of Final Judgment by Default, as described herein.

### I.    BACKGROUND

On May 30, 2012, the Securities and Exchange Commission (the "SEC") filed this action against seven defendants, including Compass Capital Group, Inc. ("Compass"), alleging, among other claims, violations of Sections 5(a) and 5(c) of the Securities Act of 1933 arising from the alleged illegal distribution of billions of shares of

penny stock[1] that were not registered and that did not qualify for the exemption from registration reflected in Section 3(a)(10) of the Securities Act.  Sections 5(a) and 5(c) of the Securities Act of 1933 prohibit selling, offering to sell, or offering to buy unregistered securities.  See 15 U.S.C. §§ 78e(a) and 78e(c).   Section 3(a)(10) of the Securities Act provides an exemption from registration that permits a company to issue common stock to public investors

> in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.

15 U.S.C. § 77c (a)(10).

According to the allegations in the complaint, Defendant Compass is a New York corporation which purports to provide consulting and investment banking services to clients, including penny stock issuers.  (Dkt. 1 at 13)  Defendant Mark A. Lefkowitz ("Lefkowitz") held himself out as the President and Chief Executive Officer ("CEO") of Compass.  (Id. at 11)  Lefkowitz had trading authority in Compass's brokerage accounts and was an authorized signatory on Compass's bank accounts.   (Id.)   The SEC previously sued Lefkowitz and Compass in federal court in Nevada and, on November 30, 2009, the Nevada Court entered final judgment against both Lefkowitz and Compass which permanently enjoined them from engaging in conduct which violates several sections of the Securities Act, including Sections 5(a) and 5(c) of the Securities

---

[1] A penny stock includes any equity security with a price of less than $5.00, except as exempted under Rule 3a51-1 under the Exchange Act.  S.E.C. v. Huff, 758 F.Supp.2d 1288, 1357 (S.D. Fla. 2010); 17 C.F.R. § 240.3a51-1.

Act.  (Id. at 12, 14)[2].  The final judgment also included a penny stock bar against Compass and Lefkowitz for a period of five years.

The SEC alleges that from July 19, 2004 through October 11, 2005, Defendant Unico, Inc. ("Unico"), an Arizona corporation with its headquarters in San Diego, California, and which purports to be in the mining business, issued at least seventeen convertible debentures to Compass and other offshore entities for which Lefkowitz served as the U.S. agent and representative (collectively, the "Lefkowitz Entities").  (Id. at 21)  The convertible debentures had the same basic terms, including a six month maturity date, an annual accrued interest rate of eight percent, and conversion rights that gave both the debt holder and Unico the option of converting "all or any part of the principal plus accrued interest into shares of Unico's common stock at a price per share equal to fifty percent of the closing bid price of the common stock on the date of the notice of conversion."  (Id. at 22)  Under the terms of the convertible debentures, if either party requested a conversion, Unico was required to issue unrestricted shares to the debt holder, either through a transaction pursuant to a registration statement or the application of an exemption from registration.  (Id. at 22)  Furthermore, according to the SEC, because the discount rate was so favorable to the debt holder, the debt holder had an incentive to choose the conversion option rather than accept the accrued interest at maturity.  (Id.)

The SEC alleges that when the convertible debentures were issued to Compass and the other Lefkowitz Entities, Unico was a Business Development Company ("BDC") under the Investment Company Act of 1940 ("Company Act"), and as a result, was

---

[2] The Nevada action is styled S.E.C. v. Compass Capital Group, Inc., et al., Case No. 2:08-cv-457-ECR-PAL.

allowed to issue securities without filing a registration statement pursuant to the exemption from registration provided in Regulation E of the Securities Act[3] if certain requirements were satisfied.  (Id. at 23)  Through mid-October 2005, as the convertible debentures started to mature, one of the Lefkowitz Entities exercised its conversion rights, which resulted in the issuance of unrestricted shares of Unico common stock pursuant to the Regulation E exemption.  (Id. at 24)

On October 12, 2005, however, Unico withdrew its status as a BDC and could no longer issue unrestricted common stock pursuant to the Regulation E exemption.  (Id. at 25)  At the time, the Lefkowitz Entities, including Compass, still owned twelve Unico convertible debentures and, when such debentures matured, Unico could not satisfy its obligations to pay or issue securities without first filing a registration statement.  (Id. at 25)  Thereafter, Lefkowitz and Defendant Mark. A. Lopez ("Lopez"), the then CEO of Unico, began discussing other ways for Unico to satisfy its obligations under the convertible debentures, including by having Unico file a registration statement with the SEC.  (Id. at 26)  In early 2006 Lopez met with certain attorneys at a New York based law firm who informed Lopez that a registration statement could take at least eighteen months to draft, could cost a significant amount of money, and ultimately might not be declared effective by the SEC.  (Id. at 27)  Thereafter, following Lopez's conversation with the New York attorneys, Lefkowitz and Lopez devised a plan not only to satisfy

---

[3] This exemption provides, in pertinent part, "securities issued by any small business investment company which is registered under the Investment Company Act of 1940, or any closed-ended investment company that has elected to be regulated as a business development company under the Investment Company Act of 1940 or has notified the Commission that it intends to elect to be regulated as a business development company pursuant to section 54 of the Investment Company Act of 1940, will be exempt from registration under the Securities Act of 1933, [subject to certain terms and conditions]."  17 C.F.R. § 230.602(a).

Unico's obligations on the outstanding convertible debentures, but also, to provide funding to Unico, through the misuse of the Section 3(a)(10) exemption. (Id. at 32)

The SEC alleges the plan called for the Lefkowitz Entities, including Compass, to file lawsuits against Unico purportedly to recover the past due amounts owed on the convertible debentures and for Unico to settle the lawsuits by issuing shares of Unico common stock to the Lefkowitz Entities pursuant to the Section 3(a)(10) exemption. (Id. at 33)  Under the plan, the settlement shares valued at a substantial discount to the prevailing market price as well as to the fifty percent discount as reflected on the face of each convertible debenture, and the settlement agreements would reference only the amount of shares to be issued, not the market value of the shares. (Id.)  According to the allegations in the SEC's complaint, the result would be that, if the Section 3(a)(10) settlement was approved in a fairness hearing before the court in which the cases were pending, the debt holder (a Lefkowitz Entity or Entities) would receive unrestricted shares that could immediately be sold on the open market at values that were multiple times greater than the face value of the debenture. (Id.)  The plan included an agreement for the Lefkowitz Entities, including Compass, or their intermediaries to remit as kickbacks monies to Unico, thereby providing Unico with much needed financing. (Id.)  According to the SEC, the plan was a win-win situation for all parties to the transaction, but it was illegal. (Id.)

Thereafter from February 9, 2006 through January 2, 2008, the Lefkowitz Entities, including Compass, filed thirty-four pre-settled lawsuits against Unico in the Twelfth Circuit Court in and for Sarasota County, Florida (the "Sarasota County Court"), according to the plan. (Id. at 34)  The SEC alleges that the way these lawsuits typically

operated was that Lefkowitz and Lopez would select a past due Unico convertible debenture that had been issued to one of the Lefkowitz Entities. (Id. at 35)  Lefkowitz would then seek to exercise the entity's conversion right and/or would divide the past due convertible debenture into segments, and would assign the segments to other Lefkowitz Entities, whose conversion rights Lefkowitz would then seek to exercise. (Id.) Lefkowitz and Lopez would then discuss the terms of a settlement, including the number of shares of Unico common stock that Unico would issue to each debt holder in exchange for the past due debt. (Id. at 36)  According to the SEC, the number of settlement shares was ultimately determined by a negotiated price that gave each debt holder a greater than fifty percent discount to the per share market price of Unico common stock, i.e., a discount that exceeded what the debt holder was entitled to under the debenture. (Id.)  As an example, the SEC maintains that Compass owned a $15,000.00 segment of a past due Unico convertible debenture pursuant to which $16,647.44 was due and owing to Compass. (Id.)  On February 9, 2006, the date the settlement agreement between Unico and Compass was executed, Unico common stock closed at a price of $0.004 per share. (Id.)  However, Lefkowitz and Lopez agreed that the number of settlement shares to be issued would be calculated based on a price per share of $0.000625, which translated into Unico agreeing to issue a total of 26,630,269 shares of its common stock to Compass in settlement of that segment of the debenture. (Id.)  The shares had a market value of approximately $106,521.00 on the date of the settlement, or, more than six times the value of the past due debt. (Id.)

The SEC alleges that in practice, there was little negotiation on the discount price or the number of shares to be issued in the Section 3(a)(10) settlement. (Id. at 37)

6

According to the SEC, Unico needed financing and Lopez typically accepted whatever number of shares of Unico common stock that Lefkowitz proposed in exchange for the past due debt, even though it meant that the debt holder would receive shares valued well in excess of the amount of debt being extinguished.  (Id.)  The debt holders, or the Lefkowitz Entities, that held the convertible debenture or segments thereof, would then file a complaint against Unico in the Sarasota County Court.  (Id.)  Shortly thereafter, the parties would execute and submit to the court, for consideration at a fairness hearing, the previously negotiated settlement agreements.  (Id. at 39)  The SEC alleges that none of the pleadings or papers submitted to the Sarasota County Court in connection with the filed lawsuits disclosed the market value of the shares that were to be issued in connection with the settlement, nor did they disclose the parties' agreement to remit monies to Unico after selling the settlement shares.  (Id. at 41)

Instead, the SEC maintains, the papers submitted to the court misleadingly stated that "no promise or representation of any kind has been made by the parties except as expressly stated in this Agreement."  (Id.)  Each settlement agreement was signed by Lopez as the CEO of Unico and, depending on which Lefkowitz Entity was a settling debt holder, by Lefkowitz as the CEO of Compass, or by an officer or director of one of the other Lefkowitz Entities after Lefkowitz forwarded them the negotiated settlement agreement for signature.  (Id.)  During each fairness hearing, the parties, through local Florida counsel, orally stipulated to the fairness of the settlement terms, including the exchange of the past due debt for unrestricted shares of Unico common stock.  (Id. at 42)  However, at no point during the fairness hearing did the parties inform the presiding judge what the market value of the settlement shares was, or that the

market value of the settlement shares vastly exceeded the value of the debt being extinguished.  (Id.)  The parties also never disclosed to the presiding judge that the parties had a side agreement to later remit monies to Unico.  (Id.)  Thus, according to the SEC, the presiding judge did not have complete information on which to base his/her fairness determination.  (Id.)

The SEC alleges that since the true value of the settlements and the existence of the side agreements to remit monies to Unico were not disclosed to the Sarasota County Court, proper fairness hearings were not held and the Section 3(a)(10) exemption was not available to Unico.  (Id. at 43)  The SEC maintains that following the entry of an order approving the settlement agreement in each case, and at Lefkowitz's direction, Unico's transfer agent was sent a copy of the order and executed settlement agreement.  (Id. at 44)  The transfer agent thereafter issued unrestricted shares of Unico common stock to the appropriate Lefkowitz Entity, including Compass, in purported reliance on the Section 3(a)(10) exemption.  (Id.)  According to the SEC, none of the transactions in which shares were issued were registered with the SEC or qualified for any exemption from registration, including Section 3(a)(10).  (Id.)

The SEC alleges that, typically, within days or weeks after receiving the settlement shares, the Lefkowitz Entities, including Compass, sold the shares on the open market to public investors who were unaware of the dilutive effects of the new stock issuances.  (Id. at 45)  As these settlements occurred, Unico periodically received wire transfers of money from Compass or an intermediary affiliated with the Lefkowitz Entities in amounts ranging from $15,000 to $800,000, consistent with what Lefkowitz and Lopez had previously negotiated.  (Id. at 46)  These payments were Unico's

principal source of financing during this period.   (Id.)   After Unico received the payments, and in an effort to conceal the kickbacks, Unico issued Compass or one of the Lefkowitz Entities a new convertible debenture with a face value equal to the amount of the kickback.   (Id. at 48)   According to the SEC, such newly-issued convertible debentures were not bona fide debts of Unico as Unico had no plan to repay the holders other than through future lawsuits and settlements in which it sought to issue shares pursuant to the Section 3(a)(10) exemption.   (Id.)

The SEC alleges that overall, as a result of the thirty-four separate lawsuits relating to Unico convertible debentures, Unico extinguished less than $4 million in debt and issued 8,921,335,034 shares of unrestricted common stock to the Lefkowitz Entities, including Compass, in purported reliance on the Section 3(a)(10) exemption. (Id. at 49)   These shares had a market value of $28,331,307.22 as of the dates when the settlement agreements were executed, or, on average, seven times the value of the past due debt that was allegedly being extinguished.   (Id.)   In nine of the settlements, in which Compass was a party, Unico issued more than 1.7 billion unrestricted shares of its common stock to Compass.   (Id. at 51)   Lefkowitz caused Compass to sell those shares within days or weeks after they were received, generating gross sales proceeds totaling approximately $2,475,000.   (Id.) Lefkowitz also caused Compass to remit a total of $765,000 to Unico over time.   (Id.)   Unico, in turn, issued new convertible debentures to Compass for the amount of the payments and then falsely recorded the payments on its books and records as proceeds from the sale of additional Unico convertible debentures.   (Id.)   As noted, Unico had no intent to satisfy its obligations under these new convertible debentures.   (Id.)

Based on the alleged scheme, the SEC maintains that Compass, along with the other defendants, singly or in concert, directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell shares of Unico common stock through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, shares of Unico common stock for the purpose of sale of delivery after sale; and/or (c) made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy shares of Unico common stock through the use or medium of a prospectus or otherwise.  (Id. at 130)  The SEC alleges no valid registration statement was filed or was in effect with the SEC pursuant to the Securities Act with respect to the transactions that resulted in the issuance of such shares of Unico common stock and no exemption from registration was available.  (Id.)

This Complaint was filed to redress the violations on May 30, 2012.  The record in this case indicates that a "Waiver of the Service of Summons" was filed on behalf of Compass on August 22, 2012.  (Dkt. 12)  Compass never answered or otherwise responded to the Complaint.  Accordingly, a Clerk's default was entered against Compass on October 4, 2012.  (Dkt. 42)  The SEC's motion for final default judgment against Compass is now before the Court.

## II.    DISCUSSION

In its motion, the SEC requests entry of final judgment against Compass and seeks: (i) an order directing Compass to disgorge $3,169,650 plus prejudgment interest;

(ii) a civil penalty of $3,169,650[4], which the SEC contends is equal to Compass's pecuniary gain; and (iii) an order permanently barring Compass from participating in any offering of any penny stock.   The SEC contends the unchallenged allegations in the complaint establish that Compass violated Sections 5(a) and 5(c) of the Securities Act. On the issue of damages, the SEC argues that Compass's role was an indispensible part of the scheme pursuant to which more than 1.7 billion unregistered shares were issued based on material misrepresentations directed to the Sarasota County Court nine different times.   The SEC maintains that Compass is also a recidivist violator of the federal securities laws, including Sections 5(a) and 5(c) of the Securities Act, because it employed a fluid and continuous illegal strategy to mislead the court and to improperly obtain a Section 3(a)(10) exemption.     The SEC also maintains a permanent penny stock bar is warranted due to the seriousness of Compass's actions and due to its previous violation of the Securities Act.   Compass has not responded to the SEC's motion and the deadline to do so has long passed.

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a). However, a defendant's default alone does not require the court to enter a default judgment. DIRECTV, Inc. v. Trawick, 359 F.Supp.2d 1204, 1206 (M.D. Ala. 2005).   To enter a judgment, there must be a sufficient basis in the pleadings to support the entry of judgment.   Id.; S.E.C. v. Barriermed, Inc., 2010 WL 4056021, at *1 (M.D. Fla. 2010)

---

[4] Although the complaint alleges that Compass only received gross proceeds in the amount of $2,475,000 in the open market from the sale of the unregistered securities, the SEC maintains in its motion that a review of the settlement agreements, transfer of agent records, brokerage account statements and bluesheets have since shown that Compass received gross proceeds of $3,169,650 from the sale of the securities.

("A court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for such entry). "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.  In short, . . . a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover." Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).[5]  Where, as here, a request for monetary relief is made, the Court may enter judgment without a hearing if "the plaintiff's claim against [the] defendant is for a sum certain or for a sum which can by computation be made certain," or if "the amount claimed is a liquidated sum or one capable of mathematical calculation," or if the movant submits sufficient evidence to support the request for damages.  See S.E.C. v. Smyth, 420 F.3d 1225, 1231 (11th Cir. 2005); United Artists Corp. v. Freeman, 605 F.2d 854 (5th Cir. 1979); Barriermed, Inc., 2010 WL 4056021, at *1.

### A.  Liability Under Sections 5(a) and 5(c) of the Securities Act of 1933

Count I of the SEC's complaint alleges that Defendant Compass violated Sections 5(a) and 5(c) of the Securities Act of 1933.  To establish a prima facie violation of Section 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities, (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect.  See S.E.C. v. Calvo, 378 F.3d 1211, 1214-15 (11th Cir. 2004) (citations omitted).  To demonstrate that a defendant sold securities, the SEC must prove that the defendant was a "necessary participant" or "substantial factor" in the illicit sale.  Calvo,

---

[5] Decisions of the Fifth Circuit entered prior to October 1, 1981, are binding on the Eleventh Circuit. Bonner v. City of Richard, 661 F.2d 1206, 1209 (11th Cir. 1981).

378 F.3d at 1211 (citations omitted).  Scienter is not a consideration.  Id. (quoting Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir. 1980)).  Once a prima facie case has been established, the burden shifts to the defendant to prove that the securities or transactions involved were exempt from the Securities Act registration requirements. See S.E.C. v. Big Apple Consulting USA, Inc., 2011 WL 3753581, at *6-7 (M.D. Fla. 2011).

In this case, the Court finds the well-pleaded allegations in the SEC's complaint, which are deemed admitted by Compass's failure to answer or respond to the complaint, are sufficient to demonstrate that Compass violated Sections 5(a) and 5(c) of the Securities Act.  Further, by failing to defend in this action, Compass has also failed to meet its burden of showing that the securities or transactions involved were exempt from the Securities Act registration requirements.  Accordingly, the Court finds Compass's actions violated Sections 5(a) and 5(c) of the Securities Act of 1933.

### B.  Monetary Relief and Penny Stock Bar

The SEC requests that Compass be ordered to disgorge $3,169,650 plus prejudgment interest, and that a civil penalty of $3,169,650, which the SEC contends is equal to Compass's pecuniary gain, be entered against Compass.  The SEC also seeks a permanent bar against Compass preventing it from ever participating in any offering of any penny stock.

Disgorgement is an equitable remedy designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws.  S.E.C v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978).  "The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."  Cavo, 378

F.3d at 1217.  The burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation.  Id. "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."  Id.  The amount to be disgorged is limited to the amount, with interest, by which the Defendant profited from the wrongdoing.  Blatt, 583 F.2d at 1335; S.E.C. v. Lauer, 2008 WL 4372896, at *26 (S.D. Fla. 2008).  The award of prejudgment interest is discretionary.  S.E.C. v. Carillo, 325 F.3d 1268, 1269 (11th Cir. 2003).  However, "[w]here a securities law violator has enjoyed access to funds over a period of time as a result of his wrongdoing, requiring the violator to pay prejudgment interest is consistent with the equitable purpose of disgorgement."  S.E.C. v. Utsik, 2009 WL 1404726, at *15 (S.D. Fla. 2009).  Courts have applied the IRS under payment rate in calculating prejudgment interest.  S.E.C. v. Yun, 148 F.Supp.2d 1287, 1293 (M.D. Fla. 2001); Huff, 758 F.Supp.2d at 1363.  "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [its] fraud."  Huff, 758 F.Supp.2d at 1363.  The time frame for the imposition of prejudgment interest usually begins on the date of the unlawful gain and ends on the date of the entry of judgment.  Yun, 148 F.Supp.2d at 1293.  As a standard practice, this Court uses the interest rate of the 52-Week United States Treasury Bill during the applicable time frame to calculate prejudgment interest.  Id.

The purpose of a civil penalty is to punish the individual violator as well as to deter future violations.  Lauer, 2008 WL 4372896, at *26.  Civil penalties are determined in light of the facts and circumstances of each case.  S.E.C. v. Aerokinetic Energy

<u>Corp.</u>, 2010, WL 5174514, at *7 (M.D. Fla. 2010)   Section 20(d) of the Securities Act authorizes the Court to issue a civil penalty against Compass up to $50,000 per violation, or the gross amount of the pecuniary gain to the Defendant.   15 U.S.C. § 77t(d); <u>Huff</u>, 758 F.Supp.2d at 1364-65.   Here, the SEC seeks the amount of the pecuniary gain to the Defendant.

Finally, Section 20(g) of the Securities Act authorizes the Court to impose a penny stock bar against any person "participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock."   15 U.S.C § 77t(g); <u>Huff</u>, 758 F.Supp.2d at 1357.   Before a court may enter a penny stock bar, the SEC must demonstrate that the stock at issue in the violations under review is, in fact, a penny stock. <u>Id</u>. at 1358 (citations omitted).   The length of the bar is within the Court's discretion and may be permanent.   15 U.S.C. § 77t(g).

The Court finds, based on the allegations in the complaint and evidence presented by the SEC, which are not disputed by Defendant Compass, all of the relief sought by the SEC in this case is warranted.   The SEC submits the sworn affidavit of Drew M. Dorman, the principal attorney who handled the SEC's investigations in this case.   (Dkt. 80)   The affidavit and the attachments thereto, including Compass's settlement agreements, Unico's transfer agent records, Compass's brokerage account statements and blue sheet data, indicate that 1,687,982,504 unregistered shares of Unico common stock were transferred to Compass's accounts at the following broker-dealers: (1) 74,824,609 unregistered Unico shares were transferred to Compass's account at A.B. Watley Direct Inc., Account No. XXXXX812; (2) 1,000,000,000 unregistered Unico shares were transferred to Compass's account at NewBridge

Securities Corporation, Account No. XXX-XXX572; (3) 200,000,000 unregistered Unico shares were transferred to a Compass's account at Stifel, Nicolaus, & Company, Inc., Account No. XXXX-X029; and 413,157,895 unregistered Unico shares were transferred to an account that was cleared by North American Clearing, Inc., Account No. XXXX-XXXX415.  (Id.)  The evidence indicates that from these accounts, Compass then sold 1,687,982,504 unregistered Unico shares into the open market, receiving gross proceeds of $3,169,650 from the sales.  (Id.)  The evidence further indicates that Compass's last sale of unregistered Unico shares occurred on November 30, 2007.  (Id.)  As stated, Compass has not presented any evidence of its own to dispute the evidence presented by the SEC in this case.  Therefore, the SEC's motion, including its requests for disgorgement with prejudgment interest, civil penalty, and a permanent penny stock bar against Compass, is due to be **GRANTED**.

Accordingly, based on consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Plaintiff Securities and Exchange Commission's Motion for Entry of Final Judgment by Default Against Compass Capital Group, Inc.  (Dkt. 79) is **GRANTED**;

2. The Court **ORDERS** the following remedies against Compass:

   a. Disgorgement in the amount of $3,169,50.00 plus prejudgment interest to be calculated  pursuant to the 52-Week Treasury Bill from November 2007 to the entry of this judgment.

   b. Civil penalty in the amount of $3,169,50.00 against Defendant Compass.

    c.  Defendant Compass is permanently barred from participating in the offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or including or attempting to induce the purchase or sale of any penny stock.

3.  The Court withholds entry of judgment pending the SEC's submission of a final calculation of prejudgment interest in accordance with this Order.

**DONE and ORDERED** in Tampa, Florida this 6th day of September 2013.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Parties